1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

UNITED STATES OF AMERICA,

10                    Plaintiff,

11          v.                                    CASE NO. C00-890JLR

12   RSR CORPORATION, et al.,                     ORDER

13                    Defendants.

14

15

16                            **I.  INTRODUCTION**

17          This matter comes before the court on a motion for summary judgment from

18   Defendants RSR Corporation ("RSR"), Quemetco, Inc. ("Quemetco"), and Quemetco

19   Realty, Inc. ("Quemetco Realty") (Dkt. # 79); and a motion for summary judgment from
20
     the United States ("Government") (Dkt. # 78).  The court initially considered the parties'
21
     briefing and supporting documentation and issued a tentative order (Dkt. # 87) to guide
22
23   the parties at oral argument.  After oral argument, the court ordered supplemental

24   briefing, which the court has received and considered.  For the reasons stated below, the

25   court DENIES the Defendants' motion for summary judgment and GRANTS the

26   Government's motion.

27

28

ORDER – 1

**II. BACKGROUND**

The parties should read this order in conjunction with the court's tentative order, and the court will use the shorthand it adopted in its tentative order here. In the tentative order, the court summarized the factual background relevant to these motions and indicated its intent to grant Defendants' summary judgment motion unless the Government was able to persuade the court otherwise at oral argument.

The Government took two approaches in response to the tentative order. First, it attempted to persuade the court to adopt different legal reasoning with respect to the court's conclusion that this lawsuit is not a remedial CRA, and thus is not subject to the six-year statute of limitations in 42 U.S.C. § 9613(g)(2)(B). The court is not persuaded, and now adopts Part III.A-D and Part III.F of the tentative order as a component of its final ruling on Defendants' motion. This lawsuit is not a remedial CRA.

In its second approach, the Government argued that even if this lawsuit is a removal CRA, it is timely because the Government filed suit within three years of the completion of removal action at the SGOU. Before oral argument, the Government filed a declaration (Dkt. # 88) containing evidence that was not part of the record before the court, although it was part of the SGOU administrative record. The Government's sole justification for not timely submitting this evidence was that it believed that the argument that this lawsuit is a timely remedial CRA was "a winner" and thus it did not need to support its alternate argument that this lawsuit is a timely removal CRA.

The court finds the Government's litigation strategy to be dubious at best, but will nonetheless consider the late-submitted evidence. The Government's choice to place its proverbial eggs in the remedial CRA basket could have been fatal to this lawsuit, and

ORDER – 2

only the court's strong preference for deciding this matter on its merits leads it to exercise its discretion to consider the Government's new evidence.

The new evidence provides the factual background for this order. After entering the consent decree, the settling PRPs began implementing the remedy the Government selected in the January 1996 ROD. For example, Seattle Iron & Metals Corporation ("SIMC") conducted soil sampling to identify contamination "hot spots" in accordance with the Government's April 1997 plan for soil sampling and analysis. SIMC reported the results of the sampling in February 1998 ("SIMC Report"). Thompson Supp. Decl., Ex. 1. Another group of settling PRPs, the Harbor Island PRP Group, submitted a "30% Remedial Design Report" in March 1998. Thompson Supp. Decl., Ex. 2. That report detailed the Group's largely conceptual work on implementing the Government's selected remedy. In September 1998, Todd Pacific Shipyards ("Todd Pacific") submitted a "100% Design" for the recovery of petroleum contaminants in groundwater on its property. Thompson Supp. Decl., Ex. 3.

### III. ANALYSIS

**A.    The Government's New Evidence Shows that Removal Action at the SGOU Ended After May 1997.**

The issue now before the court is when removal action at the SGOU ended. As explained in the tentative order, this lawsuit is a timely removal CRA only if removal ended on May 22, 1997 or later. The Government argues that its new evidence shows that removal activity as to the SGOU soils ended in September 1998 with the submission of the Todd Pacific 100% Design report, and that removal activity as to the SGOU groundwater is still ongoing, because the settling PRPs have yet to conclude their design investigation. Defendants do not dispute that the activity chronicled in the Government's

ORDER – 3

new evidence actually occurred.  The question before the court is thus purely legal:  Was any of the remedial design work at the SGOU after May 1997 removal activity?[1]

The court must answer this question in the Government's favor if even one action taken at the SGOU after May 1997 qualifies as removal activity.  Courts have consistently interpreted CERCLA to permit only a single "removal action" for a site.  E.g., Colorado v. Sunoco, Inc., 337 F.3d 1233, 1241 (10th Cir. 2003); see also Kelley v. E.I Dupont de Nemours & Co., 786 F. Supp. 1268, 1276-77 (E.D. Mich. 1992) (rejecting defendants' argument that response constituted two or three separate removal actions), aff'd 17 F.3d 836 (6th Cir. 1994).  The Ninth Circuit has never considered this "single removal rule," but the court assumes that it would adopt it, following virtually every other court that has faced the issue.  Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc., 308 F. Supp. 2d 1124, 1132-33 (C.D. Cal. 2004) (reviewing cases adopting single removal rule and noting that in CERCLA's history, only one court has ever made an exception).  Under this rule, if any response action at the SGOU after May 1997 was removal activity, the removal action at the SGOU ended after May 1997, and this lawsuit is timely.

The court turns first to SIMC's sampling and evaluation of soil at its SGOU property as a candidate for a timely removal activity.  SIMC sampled soils from May 13-15, 1997 and during the week of November 17, 1997.  SIMC Report at 5.  SIMC conducted the sampling to identify soil "hot spots" that would require excavation and treatment under the Amended ROD.  SIMC Report at 2.  SIMC found soil with contaminant levels exceeding hot spot criteria, but also found that the contaminated soil

---

[1]As noted in the tentative order, characterizing activity as "removal" or "remedial" is a question of law, not a question of fact.  Advanced Micro Devices, Inc. v. Nat'l Semiconductor Corp., 38 F. Supp. 2d 802, 809 (N.D. Cal. 1999).

ORDER – 4

was not present in discrete hot spots.  SIMC Report at 19.  SIMC conducted the sampling

and provided the report to "support remedial design efforts for the SIMC properties as a

component of efforts for the [SGOU]."  SIMC Report at 1.

      The SIMC soil sampling fits CERCLA's definition of removal activity.  Removal

action includes "such actions as may be necessary to monitor, assess, and evaluate the

release or threat of release of hazardous substances . . . ."  § 9601(23).[2]  As part of a

larger effort to design and implement the remedy the Government selected in the

amended ROD, SIMC assessed and evaluated the soil on its property for hazardous

substances, including petroleum compounds and polychlorinated biphenyl compounds.

SIMC Report at 2-5.  Other courts have held that similar post-ROD activities are removal

actions.  E.g., United States v. Akzo Nobel Coatings, Inc., 990 F. Supp. 897, 907 (E.D.

Mich. 1998) (interpreting § 9601(23) to cover "site investigation and study" as a

component of "remedial design"); United States v. Atlantic Richfield, 147 F. Supp. 2d

614, 621 (S.D. Tex. 2001) (characterizing the installation of air monitoring platforms

after ROD as removal activity); Louisiana v. Braselman Corp., 78 F. Supp. 2d 543, 549

(E.D. La. 1999) (holding that post-ROD construction and evaluation of two on-site

extraction systems "was part of the design investigation, not a permanent remedy).

      On the other hand, the SIMC soil sampling meets the definition of remedial

activity as well.  CERCLA defines remedial activities as "actions consistent with

permanent remedy taken instead of or in addition to removal actions . . . includ[ing] . . .

any monitoring reasonably required to assure that such actions protect the public health

and welfare and the environment."  § 9601(24).  There is little question that SIMC's

efforts to implement the permanent remedy the Government selected in the amended

---

[2]Unless otherwise noted, all statutory references are to Title 42 of the United States Code.

ORDER – 5

ROD are "consistent with permanent remedy," and monitoring soil to determine which areas required more extensive "hot spot" remediation seems reasonably required to protect the environment.  But see Atlantic Richfield, 147 F. Supp. 2d at 621 (finding that monitoring undertaken prior to on-site construction of a remedial action is not remedial action under § 9601(24)).  In addition, a few courts have characterized post-ROD remedial design work as remedial action.  E.g., California v. Celtor Chem. Corp., 901 F. Supp. 1481, 1488 (N.D. Cal. 1995); United States v. Petersen Sand & Gravel, Inc., 824 F. Supp. 751, 755 (N.D. Ill. 1992).

The court holds that SIMC's soil sampling was removal action, and may have been remedial action as well.  Other courts have recognized that some response actions can be both remedial and removal actions under CERCLA's broad definition of each term. Geraghty & Miller, Inc. v. Conoco Inc., 234 F.3d 917, 926 (5th Cir. 2000) ("[T]he CERCLA definitions are expansive enough that certain activities may well be covered by both."); California v. Neville Chem. Co., 213 F. Supp. 2d 1115, 1127 (C.D. Cal. 2002) (citing Geraghty & Miller and noting that "[t]he difficulty presented by these two definitions is that they both may cover the same activity."); Public Serv. Co. v. Gates Rubber Co., 175 F.3d 1177, 1182 (10th Cir.1999) ("Elements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed."). Because SIMC's activities in May and November 1997 fit within the amorphous boundaries of "removal action" articulated in CERCLA and cases interpreting it, the court holds that removal action at the SGOU continued until at least November 1997.  The court need not reach Defendants' contention that the activity was remedial.  See Hatco Corp. v. W.R. Grace & Co.-Conn., 849 F. Supp. 931, 962 (D.N.J. 1994) ("A response action may constitute both a removal and a remedial action, and a court is not constrained to find either term applicable at the expense of the other.").

ORDER – 6

Both parties advocate a cleaner distinction between removal and remedial action, relying in part on California v. Neville Chem. Co., 358 F.3d 661 (9th Cir. 2004).  The Government argues that remedial action cannot begin until the completion of remedial design.  Gov't Supp. Brief at 4 (citing Neville).  The Neville court, however, merely noted that the "commencement of on-site construction of remedial action" cannot occur until after the remedy is designed.  358 F.3d at 668 n.5 (citing H.R. Rep. 99-253(III)).  This component of the Neville decision merely addresses the triggering event for the statute of limitations for a remedial CRA, i.e. the "on-site construction of the remedial action" in § 9613(g)(2)(B).  The Neville court had no occasion to characterize activity that occurs before the on-site construction of remedial action, but after the selection of a final remedy in a ROD.  Moreover, the Neville court expressly rejected the "final remedial design" as the "pivotal event" for defining the initiation of a remedial action.  Id. at 671.  Neville does not support the Government's contention that final remedial design is the pivotal event for defining the conclusion of removal action.

Defendants seek a line of demarcation based on Neville as well.  They contend that activities "consistent with the permanent remedy" are remedial actions, and actions aimed at a "more temporary objective" are removal actions.  Defs.' Supp. Brief at 7.  They correctly note that Neville held that actions consistent with the permanent remedy are remedial (358 F.3d at 667), and that the permanent remedy is the "final remedial action plan,"[3] not the final remedial design (358 F.3d at 670 n.7).  Indeed, consistency with the final remedial action plan is the hallmark of remedial action under Neville.  The court noted, for example, that CERCLA lists the "provision of alternative water supplies"

---

[3]The Neville court's review of the regulations for selecting and implementing a CERCLA remedy demonstrates that, in this case, the "final remedial action plan" is the amended ROD.  358 F.3d at 670 n.7.

ORDER – 7

as both a removal activity under § 9601(23) and a remedial activity under § 9601(24).  Id. at 667.  The court explained that providing alternate water supplies "consistent[ly] with permanent remedy" would be remedial activity, whereas providing alternate water supplies "on a more temporary basis" would be removal activity.  Id.

In light of Neville, the court acknowledges the intuitive appeal of Defendants' proposed bright-line rule in which any action consistent with the permanent remedy is remedial activity *and not removal activity*.  The Neville court, however, did not reach as far.  As a matter of logic, its holding that actions consistent with the permanent remedy are remedial does not exclude those actions from the realm of removal activity.  Moreover, its holding expressly acknowledges that removal activity can continue after the adoption of a final remedial action plan.  Id. at 670.  Unfortunately, the Neville court had no need to explain how to identify such removal activity,[4] nor to comment on whether such activity might be both removal and remedial activity.  Although the Defendants' proposed dividing line between removal and remedial activity is not inconsistent with the Neville court's reasoning, the court declines to extend Neville beyond its boundaries.  The court is thus left with the "vague and overlap[ping]" definitions of removal and remedial activity in CERCLA (Alco Pacific, 308 F. Supp. 2d at 1137), and its conclusion that the SIMC soil sampling falls within the overlap.

---

[4]The Neville court's only examples of removal action occurring after a remedial action plan were two response actions that the Sunoco court characterized as removal actions.  358 F.3d at 670 (citing Sunoco, 337 F.3d at 1244).  This court has reviewed Sunoco, and it is not clear that either of the actions that court identified occurred after the adoption of a remedial action plan.  One of the removal actions, plugging a mine adit, occurred before the government even placed the site in question on the National Priorities List ("NPL").  Sunoco, 337 F.3d at 1237.  The other, construction of monitoring wells, took place in the same year.  Id. at 1237-38.  The Sunoco court did not identify the date on which the government adopted a final remedial action plan, if ever.  Id. at 1237 (noting that the government "issued four Interim Records of Decision" and that "the final site-wide remedy is still in the planning stages").  It seems unlikely that the government approved a final remedial action plan within ten months of placing the site on the NPL.

ORDER – 8

The court declines to erect a new boundary between removal and remedial action not only because the <u>Neville</u> court did not do so, but also in deference to the commandment that it construe CERCLA's statute of limitations strictly in favor of the Government.  <u>Neville</u>, 358 F.3d at 666; <u>California v. Montrose Chem. Co.</u>, 104 F.3d 1507, 1513 (9th Cir. 1997).  CERCLA's definitions of "remedial" and "removal" do not cleave response actions neatly into two mutually exclusive subsets.  The court has approached the difficult questions of statutory interpretation here as both a grammarian and a logician, and wholeheartedly agrees with the observation that "neither a logician nor a grammarian will find comfort in the world of CERCLA."  <u>Carson Harbor Vill. Ltd. v. Unocal Corp.</u>, 270 F.3d 863, 883 (9th Cir. 2001).  This court's journey through the CERCLA "maze" (<u>id.</u> at 880) leads it to the conclusion that SIMC's soil sampling was removal activity, no matter what else it might have been.  As SIMC performed part of the sampling in November 1997, less than three years before the Government filed this lawsuit, this is a timely removal CRA under § 9613(g)(2)(A).

**B.      The Defendants Do Not Need Additional Discovery.**

Defendants request additional discovery into the post-ROD actions of the settling PRPs.  They claim that the Government has consistently characterized all post-ROD response actions at the SGOU as remedial action,[5] and that it has only recently reversed course to avoid summary judgment.

---

[5]Defendants' repeatedly claim that Keith Rose, the Government's representative under Fed. R. Civ. P. 30(b)(6), bound the Government to the position that all post-ROD action at the cite was remedial.  They base the claim entirely on Mr. Rose's "admission" that he characterized certain response activities as "remedial."  The court has reviewed Mr. Rose's testimony and finds that he was, at best, offering a legal conclusion.  A witness's legal conclusions cannot bind a party.

ORDER – 9

1
2
3
4
5
6
7
8

Discovery into the settling PRPs' actions would serve no purpose.  As noted above, as long as a single settling PRP undertook a single removal action at the SGOU after May 1997, this action is timely.  Faced with the SIMC Report, Defendants do not argue that the report inaccurately describes the soil sampling at the SGOU.  Absent some indication that SIMC submitted a false (and thus fraudulent) report, there is no need for further discovery on the issue.  Defendants' statute of limitations defense fails as a matter of law, and thus further discovery would be of no value.

9

**C.     The Court Grants the Government's Summary Judgment Motion on Liability.**

10
11
12
13
14

The Government seeks summary judgment that it has made a prima facie case that Defendants are liable for response costs at the SGOU.  If the Government wins summary judgment, the only remaining issues in this action would be the amount of response costs owing, and whether Defendants have valid affirmative defenses.

15
16
17
18
19
20

To establish a prima facie case of liability under CERCLA, the Government must prove that a "release" or threatened release of hazardous substances occurred at a "facility" and the Government incurred costs in responding to the release or threatened release.  United States v. Chapman, 146 F.3d 1166, 1169 (9th Cir. 1998) (citing § 9607).  If the Government proves these elements, then it need only show that the Defendant falls within one of four categories of PRPs under § 9607(a).  Id.

21
22
23
24
25
26

Much of the Government's prima facie case is undisputed.  The lead smelter that Defendants owned and operated is unquestionably a facility within the meaning of CERCLA.  As owners and operators of the facility, Defendants are PRPs under § 9607(a)(1).  Defendants do not contest that the Government has incurred response costs (in the form of unreimbursed removal costs) at the SGOU.

27
28

ORDER – 10

1
2
3
4
5
6
7
8

Defendants attempt to raise a dispute over whether their facility released a hazardous substance, but that dispute reduces solely to how much lead their smelter released and the magnitude of that release in comparison to other PRPs. Although this dispute may be relevant to other issues in this case, it is of no value in opposing the instant summary judgment motion. Defendants have admitted that their lead smelter released lead at Harbor Island. Carman Decl. Ex. 7 (Response to Request for Admission No. 22).

9
10
11
12
13
14
15

As the facts underlying the Government's prima facie case are not in dispute, the court grants its motion for summary judgment. In granting the motion, the court emphasizes it does not reach Defendants' argument for limitation of response costs, their argument that they are entitled to credit for costs that the settling PRPs have already paid, their opposition to joint and several liability, or any of Defendants' purported affirmative defenses other than its statute of limitations defense.

16

### IV. CONCLUSION

17
18

For the reasons stated above, the court DENIES Defendants' motion for summary judgment (Dkt. # 79) and GRANTS the Government's motion (Dkt. # 78).

19
20
21
22
23
24
25
26

The court also DENIES Defendants' motion for an extension of time to file motions in limine (Dkt. # 94). Defendants filed motions in limine on September 9, 2005, and it thus appears that this motion is moot. The court directs the parties to consider the motions in limine that they have filed and to withdraw any motions that this order renders moot. If this order raises new issues that the parties could not have anticipated before the deadline for motions in limine, they may arrange a teleconference with the court to discuss the possibility of filing additional motions in limine.

27
28

This case is set for a bench trial on October 18, 2005. The court directs the parties to meet and confer to prepare a joint statement of issues to be presented at the bench trial,

ORDER – 11

and to identify each issue as a legal issue or issue of fact. If the parties are unable to agree, they shall indicate their disagreements in the joint submission. The submission shall indicate which issues require in-court witness testimony, and which do not. The parties shall file this joint submission no later than September 28, 2005.[6]

DATED this 15th day of September, 2005.

JAMES L. ROBART
United States District Judge

---

[6]In response to the court's request for supplemental briefing, the Defendants submitted a 19-page brief containing 50 footnotes. Estimating conservatively, the footnotes contain five times as much text as the main body of the brief. Indeed, it would be more accurate to state that the footnotes *are* the main body of the brief. E.g., Defs.' Supp. Brief at 4 (page contains 3 lines of main text and 35 lines of footnote text). The court notes that Defendants' other submissions to the court are similar. E.g., Defs.' Summ. Judg. Mot. (motion contains 58 footnotes in 19 pages). This is an unsubtle means of subverting the court's page limits for briefs, and the court cautions counsel to use footnotes appropriately in future submissions to the court.

ORDER – 12